IN THE UNITED STATED DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| T. JEROME HOLLERAN, | : |
| Plaintiff | : |
| | : |
| vs. | : |
| | : |
| NAVSEEKER, INC. d/b/a THE EVOGI | : JURY TRIAL DEMANDED |
| GROUP, INC., ROBERT MATHE, | : |
| ROBERT FISHMAN, TERJE | : |
| GLOERSTAD and THOMAS L. SMITH | : |
| Defendants | : |

**COMPLAINT**

**Jurisdiction**

1.     This Court maintains jurisdiction over this matter pursuant to the following:  28

U.S.C. §1332(a)(1), as Plaintiff and Defendants are citizens of different states, and the amount in

controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

**Parties**

2.     Plaintiff, T. Jerome Holleran, Jr. ("Holleran"), is an adult individual whose

principal place of residence is 1704 Acorn Drive, Sinking Spring, Berks County, Pennsylvania

19608.

3.     Defendant, Navseeker, Inc. d/b/a The Evogi Group, Inc. ("Evogi") is, on

information and belief, a Delaware corporation authorized to do business in the Commonwealth

of Pennsylvania.

4.     Evogi, by and through its authorized agents, made false and misleading

representations to Holleran to induce him to invest in Evogi, employed Holleran in the

Commonwealth of Pennsylvania, and failed to make payments to Holleran under a certain

management agreement to Holleran's home in Pennsylvania.

{00452707 }

## Individual Defendants

5.    At all times material hereto, the following Individual Defendants acted in their capacities as officers, employees and/or authorized agents of Evogi with respect to Holleran's relationship with Evogi:  Robert Mathe was President, Robert Fishman was Chief Executive Officer ("CEO"), Terje Gloerstad was Chief Technical Officer ("CTO") and Thomas L. Smith was Chief Financial Officer ("CFO").

## COUNT I
### FRAUD IN THE INDUCEMENT – FRAUDULENT MISREPRESENTATION

6.    Holleran incorporates herein by reference paragraphs 1 through 5 of this Complaint.

7.    In early 2010, Evogi was a start-up company with no meaningful insurance or telematics experience, expertise or intellectual property.

8.    In 2010, Evogi through a recruiter, first solicited Holleran to join Evogi as a Director of Consulting Services and to invest One Hundred Twenty-five Thousand Dollars ($125,000.00) ("Investment") for an equity interest in Evogi.

9.    Terje Gloerstad, then Evogi's CTO, made the following representations to Holleran:

a)    Specifically represented to Holleran that the telematics computer and website system shown to Holleran as part of the recruitment process was built by Evogi;

b)    Specifically represented to Holleran that the telematics system it allegedly built was "complete" for the purposes of introducing it to the marketplace.

10.    Thomas Smith, then Evogi's CFO, represented to Holleran:

a)    Specifically represented that a sum of Three Million Dollars ($3,000,000.00) established as a line of credit, was a "safety net";

b)      Specifically produced financial records representing the company to be "capitalized" with Three Million Dollars ($3,000,000.00).

11.     Each of the foregoing representations by Smith and Gloerstad were false when made and made to induce Holleran to contribute the Investment to Evogi and induce him to agree to accept the position of Director of Consulting Services with Evogi.

12.     During the parties' negotiations of the Senior Management Agreement, Evogi, acting through Smith, presented financial statements to Holleran and represented that the financial statements accurately reflected the financial condition of Evogi.  A copy of the Management Agreement is attached hereto as Exhibit "A".

13.     The financial statements presented by Evogi were false and misleading and intended to deceive Holleran by indicating that Evogi was in a much sounder financial condition than its true state.

14.     The financial statements presented by Evogi affirmatively misrepresented the finances of Evogi and omitted to state information necessary to make the financial statements not misleading.

15.     Contrary to Evogi's representations, a) Evogi did not have "paid-in" capital of Three Million Dollars ($3,000,000.00) beyond the Investment that Evogi was seeking from Holleran; b) all of the assets and goodwill of Evogi had not been contributed to Evogi free and clear of liabilities; c) prior monthly amounts owed Smith and Gloerstad were not paid and created a liability on Evogi; d) the technology platform and website for Evogi were not complete; and e) Evogi had not secured a line of credit adequate to service the cash flow and operating requirements of Evogi.

16.     The representations made by Evogi were material facts that were false and were known by Evogi to be false at the time they were made.

17.     Evogi intended that Holleran rely upon these representations and Holleran justifiably relied upon the representations regarding the financial condition of Evogi in making his decision to accept the Management Agreement and pay the Investment to Evogi.

18.     Holleran would not have accepted the position of Director of Consulting Services, signed the Senior Management Agreement, and paid the Investment to Evogi, if he had known the true facts.

19.     As a direct and proximate result of Evogi's intentional misrepresentations, Holleran has sustained damages of One Hundred Twenty-five Thousand Dollars ($125,000.00), together with interest and costs.

## COUNT II
### FRAUD IN THE INDUCEMENT – NEGLIGENT MISREPRESENTATION

20.     Holleran incorporates herein by reference paragraphs 1 through 19 of this Complaint.

21.     Evogi's failure to present accurate representations were the result of Evogi's negligence and lack of due care.

22.     The representations made by Evogi were material facts that were false and were known by Evogi to be false at the time they were made.

23.     Evogi intended the Holleran rely upon these representations and Holleran justifiably relied upon the representations regarding the financial condition of Evogi in making his decision to accept the Senior Management Agreement and pay the Investment to Evogi.

24.     Holleran would not have accepted the position of Director of Consulting Services, signed the Management Agreement, and paid the Investment to Evogi, if he had known the true facts.

25.     As a direct and proximate result of Evogi's intentional misrepresentations, Holleran has sustained damages of One Hundred Twenty-five Thousand Dollars ($125,000.00), together with interest and costs.

## COUNT III
### SECURITIES FRAUD
### 70 P.S. §1-401

26.     Holleran incorporates herein by reference paragraphs 1 through 25 of this Complaint.

27.     The Pennsylvania Securities Act, 70 P.S. §1-401 makes it unlawful for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly:

        a)      to employ any device, scheme or artifice to defraud;

        b)      to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

        c)      to engage in any act, practice or coarse of business which operates or would operate as a fraud of deceit upon any person.

28.     Holleran avers that Defendant Evogi, by and through its agents Smith and Gloerstad, engaged in the aforesaid acts which individually and collectively, defrauded Holleran in violation of the Securities Act.

29.     As a direct and proximate cause of Defendants statutory fraud, Holleran has been damaged in the principal amount of his investment ($125,000.00), and seeks all remedies available under the Securities Act.

## COUNT IV
### BREACH OF CONTRACT – FAILURE TO PAY

30.     Holleran incorporates herein by reference paragraphs 1 through 29 of this Complaint.

31.     In reliance upon the aforesaid representations, Holleran agreed to enter into the Management Agreement

32.     Pursuant to the Management Agreement, Holleran was hired as Director of Consulting Services during the two (2) year term of the contract.

33.     At all times material hereto, Holleran fulfilled the duties and obligations of his position.

34.     Paragraph 4(b)(i) (Compensation) of the Management Agreement required Evogi to pay Holleran an annual base salary in the amount of $75,000.00 per year, in accordance with Evogi's normal payroll policy.

35.     Paragraph 4(b)(ii) required Evogi to establish an incentive compensation plan ("ICP") for Holleran and other similarly situated employees.  Evogi, by and through its agent, Robert Stempora, represented to Holleran that the ICP bonus, would be 1.5 times his base salary, or $12,500.00.

36.     Evogi failed to perform and pay Holleran his salary beginning on February 1, 2012 but directed him to keep working and accepted the benefits of his efforts.

37.     Evogi breached the Management Agreement by failing to implement the ICP and compensate Holleran therefore.

38.     Evogi breached the Management Agreement by failing to pay Holleran his accrued but unused vacation.

39.     As a direct and proximate result of Evogi's breaches, Holleran gave notice of his constructive discharge to Evogi effective March 15, 2012.  A true and correct copy of the discharge letter is attached hereto as Exhibit "B" and incorporated herein by reference.

40.     Evogi's breaches of the Management Agreement constitute "termination without cause" under §4(g) (Severance), thereby triggering the severance obligation of Evogi to Holleran by way of continuation of his salary payments for the balance of the term of the Agreement.

41.     Based upon the foregoing, Holleran has suffered damages in the principal amount of One Hundred Six Thousand Two Hundred Fifty Dollars ($106,250.00) in unpaid salary and Six Thousand Eight Hundred Sixty-two Dollars and Eighty-three Cents ($6,862.83) in accrued but unused vacation compensation, for a total of One Hundred Thirteen Thousand One Hundred Twelve Dollars and Eighty-three Cents ($113,112.83).

42.     Despite notice and demand therefore, Evogi refuses to pay Holleran the aforementioned sums due and owing.

## COUNT V
### WAGE PAYMENT AND COLLECTION LAW
### Holleran v. Navseeker, Inc. d/b/a The Evogi Group, Inc.

43.     Holleran incorporates herein by reference paragraphs 1 through 42 of this Complaint.

44.     By letter dated March 12, 2012, Holleran, by and through counsel, demanded Evogi's compliance with the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §260.1 et seq. and payment of the earned wages owed to him.  *See* Exhibit "B", incorporated herein by reference.

{00452707 }

45.    Holleran's letter (Exhibit "B") details the specific instances of the violations of the Act.

46.    Of the total amount of unpaid contract damages stated above, Holleran sustained a minimum lost earned wages in the principal amount of Fourteen Thousand Seven Hundred Dollars and Ninety-eight Cents ($14,700.98).

47.    Evogi is an "employer" within the meaning of the WPCL.

48.    Holleran's unpaid wages, bonus and accrued but unused vacation each constitute "wages" within the meaning of the WPCL.

49.    Holleran's wages as more fully set forth herein, remained unpaid for thirty (30) days following his separation from employment and no good faith contest or dispute of the claim exists to account for such non-payment.

50.    Holleran avers that he has fulfilled all conditions precedent to the filing of this suit.

51.    Holleran avers that based on the evidence to be produced, he is entitled to liquidated damages pursuant to the WPCL in the amount of twenty-five percent (25%) of the unpaid wages, plus interest, attorneys' fees and court costs.

### COUNT VI
**WAGE PAYMENT AND COLLECTION LAW**
**Holleran v. Robert Mathe**

52.    Holleran incorporates herein by reference paragraphs 1 through 51 of this Complaint.

53.    At all times material hereto, Robert Mathe acted in his capacity as President of Evogi.

54.    At all times material hereto, Robert Mathe was directly responsible for and had

authority to make decisions relative to the payment of wages to Holleran pursuant to the WPCL.

55.     It is averred that Robert Mathe intentionally refused to pay Holleran his wages pursuant to the WPCL.

56.     Robert Mathe's actions in this regard constitute a direct violation of the WPCL rendering him personally liable pursuant to 43 P.S. §260.2a.

## COUNT VII
### WAGE PAYMENT AND COLLECTION LAW
### Holleran v. Robert Fishman

57.     Holleran incorporates herein by reference paragraphs 1 through 56 of this Complaint.

58.     At all times material hereto, Robert Fishman acted in his capacity as CEO of Evogi.

59.     At all times material hereto, Robert Fishman was directly responsible for and had authority to make decisions relative to the payment of wages pursuant to the WPCL.

60.     It is averred that Robert Fishman intentionally refused to pay Holleran his earned wages pursuant to the WPCL.

61.     Robert Fishman's actions in this regard constitute a direct violation of the WPCL rendering him personally liable pursuant to 43 P.S. §260.2a.

## COUNT VIII
### WAGE PAYMENT AND COLLECTION LAW
### Holleran v. Thomas L. Smith

62.     Holleran incorporates herein by reference paragraphs 1 through 61 of this Complaint.

63.     At all times material hereto, Thomas L. Smith acted in his capacity as CFO of Evogi.

64.     At all times material hereto, Thomas L. Smith was directly responsible for and had authority to make decisions relative to the payment of wages pursuant to the WPCL.

65.     It is averred that Thomas L. Smith intentionally refused to pay Holleran his earned wages pursuant to the WPCL.

66.     Thomas L. Smith's actions in this regard constitute a direct violation of the WPCL rendering him personally liable pursuant to 43 P.S. §260.2a.

## COUNT IX
### WAGE PAYMENT AND COLLECTION LAW
### Holleran v. Terje Gloerstad

67.     Holleran incorporates herein by reference paragraphs 1 through 66 of this Complaint.

68.     At all times material hereto, Terje Gloerstad acted in his capacity as CTO of Evogi.

69.     At all times material hereto, Terje Gloerstad was directly responsible for and had authority to make decisions relative to the payment of wages pursuant to the WPCL.

70.     It is averred that Terje Gloerstad intentionally refused to pay Holleran his earned wages pursuant to the WPCL.

71.     Terje Gloerstad's actions in this regard constitute a direct violation of the WPCL rendering him personally liable pursuant to 43 P.S. §260.2a.

## COUNT X
### UNJUST ENRICHMENT
### Holleran v. Navseeker, Inc. d/b/a The Evogi Group, Inc.

72.     Holleran incorporates herein by reference paragraphs 1 through 71 of this Complaint.

73.     Pleading in the alternative, Holleran avers that the sales services provided to

Evogi by Holleran were requested by Evogi who received and accepted the benefits of same provided by Holleran.

74.     At all times material hereto, Evogi was aware that Holleran was providing said services to Evogi and that Holleran expected to be paid for those services.

75.     At all times material hereto, Evogi, with the aforesaid knowledge, permitted Holleran to provide the sales services and to incur damages.

76.     At all times material hereto, Evogi was unjustly enriched by retaining the benefit of receiving Holleran's sales services without paying Evogi the fair and reasonable compensation therefore.

77.     By reason of the aforesaid circumstances, Evogi is obligated to pay Holleran the value of the sales services in the amount of One Hundred Twelve Thousand, Nine Hundred Eighty-two Dollars and Thirty-nine Cents ($112,982.39).

## COUNT XI
### QUANTUM MERUIT
### Holleran v Navseeker, Inc. d/b/a The Evogi Group, Inc.

78.     Holleran incorporates herein by reference paragraphs 1 through 77 of this Complaint.

79.     Pleading in the alternative, at Evogi's request, Holleran provided and performed sales services.  The quantum meruit value of the sales services is One Hundred Twelve Thousand, Nine Hundred Eighty-two Dollars and Thirty-nine Cents ($112,982.39).

80.     Holleran, in providing the sales services, expected to be paid by Evogi.

81.     Although requested, Evogi has refused and continues to refuse to pay the outstanding commissions owed to Holleran.

82.     Evogi's failure to pay the aforesaid compensation that is due and owing to

Holleran, has caused Evogi to unjustly benefit from Holleran's sales services without paying

Holleran the fair and reasonable compensation therefore.

## COUNT XII
### Breach of Implied Warranty of Good Faith and Fair Dealing
### in the Performance of a Contract

83.    Holleran incorporates herein by reference paragraphs 1 through 82 of this

Complaint.

84.    At all times material hereto, Holleran performed all conditions of his employment

as set forth in his Employment Agreement with Evogi.

85.    At all times material hereto, Holleran continued to perform his obligations in

good faith reliance upon Evogi's promise to compensate him in accordance with the terms of the

parties' agreement.

86.    Evogi, with knowledge and specific bad faith intent, unlawfully refused to pay

Holleran's earned wages, bonuses and severance payments after the point in time where his

rights to payment had fully vested.

## COUNT XIII
### Punitive Damages
### Holleran v. Navseeker, Inc. d/b/a The Evogi Group, Inc., Robert Mathe,
### Robert Fishman, Terje Gloerstad and Thomas L. Smith

87.    Holleran incorporates herein by reference paragraphs 1 through 86 of this

Complaint.

88.    Holleran avers that Evogi and Defendants Mathe, Fishman, Gloerstad and Smith,

both individually and collectively, acted maliciously, intentionally and in wanton disregard of

Holleran's rights for which punitive damages may be awarded at common law.

WHEREFORE, Plaintiff, T. Jerome Holleran, respectfully requests this Honorable Court

to enter judgment in his favor against Defendants as follows:

      a.      As to Count I (Fraudulent Misrepresentation) v. Evogi:  for direct and consequential damages as may be proven at trial;

      b.      As to Count II (Negligent Misrepresentation) v. Evogi:  for direct and consequential damages as may be proven at trial;

      c.      As to Count III (Statutory Securities Fraud) v. Evogi:  all remedies available under the Pennsylvania Securities Act which may be proven at trial;

      d.      As to Count IV (Breach of Contract) v. Evogi:  the principal sum of One Hundred Twelve Thousand Nine Hundred Eighty-two Dollars and Thirty-nine Cents ($112,982.39) plus common law interest until paid in full;

      e.      As to Count V (WPCL Violation) v. Evogi:  all remedies available under the law which may be proven at trial including attorney fees, liquidated damages and pre- and post-judgment interest until paid in full;

      f.      As to Counts VI and VII (WPCL – Personal Liability) v. Defendants Mathe and Fishman:  all remedies available under the law as may be proven at trial pursuant to 43 P.S. §260.2a;

      g.      As to Count VIII (WPCL – Personal Liability) v. Defendant Smith:  all remedies available under the law as may be proven at trial pursuant to 43 P.S. §260.2a;

      h.      As to Count IX (WPCL – Personal Liability) v. Defendant Gloerstad:  all remedies available under the law as may be proven at trial pursuant to 43 P.S. §260.2a;

      i.      As to Count X (Unjust Enrichment) v. Evogi:  such damages as may be proven at trial;

      j.      As to Count XI (Quantum Meruit) v. Evogi:  such damages as may be proven at trial;

{00452707 }

k.      As to Count XII (Breach of Duty of Good Faith and Fair Dealing) v. Evogi:  such damages as may be proven at trial;

l.      As to Count XIII (Punitive Damages) v. Navseeker, Inc. d/b/a The Evogi Group, Inc., Robert Mathe, Robert Fishman, Terje Gloerstad and Thomas L. Smith:  such damages as may be proven at time of trial; and

m.      Such other legal and equitable relief this Court deems necessary and just, including a judicial determination voiding the underlying Management Agreement and/or the equitable reformation of same, declaring the non-competition and non-solicitation covenants set forth in paragraph 6 thereof to be invalid and unenforceable as a matter of law.

Respectfully submitted,

LEISAWITZ HELLER ABRAMOWITCH PHILLIPS, P.C.

By:      _____

Kevin A. Moore, Esquire
Attorney I.D. #75068
Thad M. Gelsinger, Esquire
Attorney I.D. #208233
2755 Century Boulevard
Wyomissing, PA 19610
(610) 372-3500
Attorneys for Plaintiff

EXHIBIT  A

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement") is made as of June 16, 2011, by and between NavSeeker, Inc., d/b/a The Evogi Group (the "Company") and its successors and assigns, and T Jerome Holleran Jr. (the "Employee"). Certain definitions are set forth in Section 7 of this Agreement.

WHEREAS, the Company had adopted and filed with the Secretary of State of the State of Delaware a Certificate of Incorporation (the "Certificate of Incorporation") authorizing the issuance of shares of Common Stock, par value $.0001 per share (the "Common Stock") and shares of Preferred Stock, par value $.01 per share (the "Preferred Stock").

WHEREAS, the parties desire to enter into an agreement pursuant to which, among other things, the Employee will be employed by the Company and purchase 46,156 shares of Common Stock from the Company from time to time in accordance with the terms, and subject to the conditions, set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

## PROVISIONS RELATING TO MANAGEMENT STOCK

1.    Purchase and Sale of Management Stock.

(a)    Within six (6) business days of the execution of this Agreement, the Employee will purchase, and the Company will sell, 29,785 shares of Common Stock (the "Initial Shares") at a price of $2.7082 per share. The Company will deliver to the Executive copies of, and a receipt for, the certificates representing such Initial Shares, and the Executive will deliver to the Company $80,663.88 by cash, wire transfer or other immediately available funds.

(b)    On or before the date that is ten (10) days from the date of this Agreement, Employee (or an account of which the Employee is the sole beneficiary) will purchase, and the Company will sell, a minimum of 16,371 shares of Common Stock (the "Post-Closing Shares" and, together with the Initial Shares, the "Management Stock") at a price of $2.7082 per share. The Company will deliver to the Employee copies of, and a receipt for, the certificates representing such Post-Closing Shares, and the Employee will deliver to the Company $44,336.26 or more by cash, wire transfer, or other immediately available funds.  In the event that the Executive fails to purchase the Post-Closing Shares, the Company shall have the right, but not the obligation to (i) repurchase the Initial Shares for an aggregate purchase price of $80,663.88 less any recruiting fees that may be due or payable to Personal Business Advisors; and (ii) terminate the Employee for Cause.

(c)    In connection with the purchase and sale of the Management Stock hereunder, the Employee represents and warrants to the Company that:

(i)     The Management Stock to be acquired by the Employee pursuant to this Agreement will be acquired for the Employee's own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act, or any applicable state securities laws, and the Management Stock will not be disposed of in contravention of the Securities Act or any applicable state securities laws.

(ii)     The Employee is an employee of the Company, is sophisticated in financial matters and is able to evaluate the risks and benefits of the investment in the Management Stock.

(iii)     The Employee is able to bear the economic risk of his investment in the Management Stock for an indefinite period of time because the Management Stock has not been registered under the Securities Act and, therefore, cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

(iv)     The Employee has had an opportunity to conduct his own due diligence, investigate and understand Company operations, the competitive market environment, risk factors and ask questions and receive answers concerning the terms and conditions of the offering of Management Stock, the nature and status of the Company's operations, and has had full access to such other information concerning the Company as he has requested and that the Company has made available.

(v)     This Agreement constitutes the legal, valid and binding obligation of the Employee, enforceable in accordance with its terms, and the execution, delivery and performance of this Agreement by the Employee does not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which the Employee is a party or any judgment, order or decree to which the Employee is subject.

(vi)     The Employee is a resident of the State of Pennsylvania.

2.     Restrictions on Transfer of Management Stock.

(a)     Transfer of Management Stock.  The Employee shall not Transfer any interest in any shares of Management Stock, except pursuant to (i) a Public Offering or a Sale of the Company ("Exempt Transfers") or (ii) the provisions of this Section 2; provided that in no event shall any Transfer of Management Stock pursuant to this Section 2 be made for any consideration other than cash payable upon consummation of such Transfer.  Prior to making any Transfer other than an Exempt Transfer, the Employee will give written notice (the "Sale Notice") to the Company.  The Sale Notice will disclose in reasonable detail the identity of the prospective transferee(s), the number of shares to be transferred and the terms and conditions of the proposed transfer.  The Employee will not consummate any Transfer until 120 days after the Sale Notice has been given to the Company, unless the parties to the Transfer have been finally determined pursuant to this Section 2 prior to the expiration of such 120-day period.  (The date of the first to occur of such events is referred to herein as the "Authorization Date").

(b)     First Refusal Rights.  The Company may elect to purchase all (but not less than all) of the shares of Management Stock to be transferred upon the same terms and conditions as those set forth in the Sale Notice by delivering a written notice of such election to

(f)    Legend.  The certificates representing the Management Stock will bear a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED AS OF JUNE ____, 2011, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER AND CERTAIN OTHER AGREEMENTS SET FORTH IN A MANAGEMENT AGREEMENT BETWEEN THE COMPANY AND T. JEROME HOLLERAN JR. DATED AS OF JUNE _____, 2011.   A COPY OF SUCH AGREEMENT MAY BE OBTAINED BY THE HOLDER HEREOF AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

(g)    Opinion of Counsel.  No holder of Management Stock may sell, transfer or dispose of any Management Stock (except pursuant to an effective registration statement under the Securities Act) without first delivering to the Company an opinion of counsel (reasonably acceptable in form and substance to the Company) that neither registration nor qualification under the Securities Act and applicable state securities laws is required in connection with such transfer.  In addition, if the holder of the Management Stock delivers to the Company an opinion of such counsel that no subsequent transfer of such Management Stock shall require registration under the Securities Act, the Company shall promptly upon such contemplated transfer deliver new certificates for such Management Stock which do not bear the first sentence of the legend set forth above.  If the Company is not required to deliver new certificates for such Management Stock not bearing such legend, the holder thereof shall not transfer the same until the prospective transferee has confirmed to the Company in writing its agreement to be bound by the conditions contained in this Section 2.

3.    Rights to Participate in Future Stock Issuances.

3.1    Participation Right.  The Company shall give notice to the Employee at least twenty (20) days prior to issuing New Securities.  Such notice shall describe the type, price, and terms of the New Securities (the "Offer Notice").  The Employee shall have ten (10) days after the date the Offer Notice is given to elect to purchase up to the number of New Securities that would, if purchased by the Employee, maintain the Employee's percentage-ownership position, which equals the proportion that the Common Stock of the Company issued and held by the Employee bears to the total Common Stock of the Company outstanding on a fully diluted basis before giving effect to the issuance of such New Securities.  The closing of such sale shall occur on the date of the closing of the sale of the New Securities, but in any event no sooner than twenty (20) days following the delivery of the Offer Notice.

(a)    The participation rights in this Section 3.1 shall not be applicable to Exempted Securities as that term is defined in Section 7 of this Agreement; and (ii) the issuance of shares of Common Stock to other employees, consultants or advisors of the Company.

(b)    The right to participate in future issuances of New Securities set forth in this Section 3.1 shall terminate upon the termination of the Employment Period (as that

the Employee within 60 days after the Sale Notice has been given to the Company. If the Company does not elect to purchase all of the shares of Management Stock specified in the Sale Notice, the Employee may transfer the shares of Management Stock specified in the Sale Notice, subject to the provisions of Section 2(c) below, at a price and on terms no more favorable to the transferee(s) thereof than specified in the Sale Notice during the 60-day period immediately following the Authorization Date. Any shares of Management Stock not transferred within such 60-day period will be subject to the provisions of this Section 2(b) upon subsequent transfer. The Company may pay the purchase price for such shares by offsetting amounts outstanding under any bona fide debts owed by the Employee to the Company.

      (c)   <u>Certain Permitted Transfers</u>.  The restrictions contained in this Section 2 will not apply with respect to (i) transfers of shares of Management Stock pursuant to applicable laws of descent and distribution or (ii) transfer of shares of Management Stock among the Employee's Family Group; provided that such restrictions will continue to be applicable to the Management Stock after any such transfer and the transferees of such Management Stock have agreed in writing to be bound by the provisions of this Agreement.

      (d)   <u>Drag Along Rights</u>. If the Company shall approve a (i) sale, transfer, lease, license or at the disposition (in one or a series of related transactions) of all or substantially all of the Company's assets to a Person or a group of Persons acting in concert, (ii) sale, transfer, lease, license or at the disposition (in one or a series of related transactions) of a majority of the outstanding shares of capital stock of the Company , to one Person or a group of Persons acting in concert, or (iii) merger or consolidation of the Company with or into another Person that is not an Affiliate of the Company, in each case in clauses (ii) and (iii) above, under circumstances in which the holders of a majority in voting power of the outstanding shares of the Company, immediately prior to such transaction, own less than a majority in voting power of the outstanding shares of the surviving or resulting entity or acquirer, as the case may be, immediately following such transaction (in any such case, an "Approved Sale") then the Employee shall consent to and raise no objections against the Approved Sale (and shall take no action to perfect or exercise any dissenters' rights with respect to the Approved Sale) and the Employee shall agree to transfer all of his/her Management Stock in the Approved Sale on the terms and conditions approved by the Company. The Employee shall take all necessary and desirable actions approved or recommended by the Company in connection with consummation of the Approved Sale, including the execution of such agreements and such instruments and other actions reasonably necessary to provide the representations, warranties, indemnities, escrows and other agreements relating to such Approved Sale.

      (e)   <u>Termination of Restrictions</u>.  The restrictions on the Transfer of shares of Management Stock set forth in this Section 2 will continue with respect to each share of Management Stock until the date on which such Management Stock has been transferred in a transaction permitted by this Section 2 (except in a transaction contemplated by Section 2(c)); provided that in any event such restrictions will terminate on the first to occur of a Sale of the Company or a Public Offering.

term is defined in Section 4(a)).

PROVISIONS RELATING TO EMPLOYMENT

4.    Employment.

(a)    Position and Duties. The Company agrees to employ the Employee and the Employee accepts such employment for the period beginning June 20, 2011 and ending upon termination pursuant to Section 4(f) hereof (the "Employment Period"). The Employee shall serve as a Director of Consulting Services of the Company and shall have the normal duties, responsibilities and authority of such position, subject to the normal power of the Company's chief executive officer and the Board. The Employee shall devote his best efforts full business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity) to the business and affairs of the Company and its Subsidiaries.

(b)    Compensation.

(i)    Salary. During the Employment Period, the Company will pay the Employee a base salary (the "Annual Base Salary") of $75,000.00 per annum or such higher rate as the Board may designate from time to time. The Board will review the Employee's Annual Base Salary at least once during each fiscal year, beginning with fiscal year 2012. The Employee's Annual Base Salary for any partial year will be prorated based upon the number of days elapsed in such year.

(ii)    Incentive Compensation. Within thirty (30) days of the date of this Agreement, the Company will establish an incentive compensation plan ("ICP") for management level employees and consultants of the Company. Employee will be entitled to participate in the ICP on the same basis as other similarly situated management level employees of the Company in accordance with the ICP policies in effect from time to time.

(iii)    Benefits. In addition, during the Employment Period, the Employee will be entitled to such vacation, disability insurance, health insurance, and other benefits as are commensurate for similarly situated management level employees of the Company, in accordance with the policies of the Company from time to time.

(c)    Expenses. The Company shall reimburse the Employee for actual out-of-pocket expenses reasonably incurred by the Employee in the performance of his services hereunder during the Employment Period and authorized and approved in accordance with the Company's policies regarding expense reporting and reimbursement in effect from time to time. All expenses shall be appropriately documented by the Employee in such format and detail as required by such policies and all applicable federal and state tax laws, regulations and rules.

(d)    Inventions. The Employee shall disclose promptly to the Company any and all conceptions and ideas for inventions, improvements, and discoveries, whether patentable or not, that are conceived or made by the Employee, solely or jointly with another, during the Employment Period or within two years thereafter, and that are related to the business or activities of the Company, regardless of whether or not such ideas, inventions, or improvements qualify as "works for hire." The Employee hereby assigns and agrees to assign all his interests therein to the Company or its nominee. To the extent the Company includes any ideas,

inventions, improvements, discoveries or other intellectual property developed by Employee prior to the Employment Period ("Prior IP") into any of its products, Employee will assign all his interests in such Prior IP to the Company or its nominee.  Whenever requested to do so by the Company, the Employee shall execute any and all applications, assignments, or other instruments that the Company shall deem necessary to apply for and obtain Letters Patent of the United States or any foreign country with respect to any such idea, invention, or discovery, or to otherwise to perfect or protect the Company's interest therein.

(e)  <u>Return of Company Property</u>.  Promptly upon termination of the Employee's employment by the Company for any reason or no reason, the Employee or the Employee's personal representative shall return to the Company (a) all Confidential Information; (b) all other records, designs, patents, business plans, financial statements, manuals, memoranda, lists, correspondence, reports, records, charts, advertising materials, and other data or property delivered to or compiled by the Employee by or on behalf of the Company  or its representatives, vendors, or customers that pertain to the business of the Company, whether in paper, electronic, or other form; and (c) all keys, credit cards, vehicles, and other property of the Company. The Employee shall not retain or cause to be retained any copies of the foregoing.  The Employee hereby agrees that all of the foregoing shall be and remain the property of Company, and be subject at all times to its discretion and control.

(f)  <u>Termination</u>. The Employment Period will continue until the first to occur of (i) the Employee's resignation, death or Disability, (ii) termination by the Company with or without Cause, or (iii) the second anniversary of the date of this Agreement, unless this agreement is extended prior to the second anniversary of the date of this Agreement

(g)  <u>Severance</u>.

(i)  <u>Termination Without Cause</u>.  If the Employee's employment is terminated by the Company without Cause, then during the remainder of the two-year period commencing on the date of this Agreement (the "<u>Severance Period</u>"), the Company shall pay the Employee at a rate equal to the Employee's Annual Base Salary, payable in equal installments on the Company's regular salary payment dates (the "<u>Severance Payments</u>").  The Employee shall not be allowed to continue participating in the Company's medical, disability and life insurance plans during the Severance Period.

(ii)  <u>Death or Disability</u>.  If the Employee's employment is terminated due to the Employee's death or Disability, then during the Severance Period, the Company shall pay the Employee (or his estate) at a rate equal to the Employee's Annual Base Salary, payable in equal installments on the Company's regular salary payment dates (the "<u>Severance Payments</u>"). The Employee shall not be allowed to continue participating in the Company's medical, disability and life insurance plans during the Severance Period.

(iii)  <u>Resignation</u>.  If the Employee's employment is terminated due to the Employee's resignation, then the Employee shall be entitled to receive his Annual Base Salary through the date of termination. All of the Employee's rights to Annual Base Salary, Annual Bonus, and benefits hereunder which accrue or become payable after the date of such termination of the Employment Period shall cease upon such termination.

(iv)   Termination With Cause. If the Employee's employment is terminated by the Company with Cause, then the Employee shall be entitled to receive his Annual Base Salary through the date of termination. All of the Employee's rights to Annual Base Salary, Annual Bonus, and benefits hereunder which accrue or become payable after the date of such termination of the Employment Period shall cease upon such termination.

5.   Confidential Information. The Employee acknowledges that the information, observations and data obtained by him during the course of his performance under this Agreement concerning the business and affairs of the Company and its Affiliates are the property of the Company, including information concerning acquisition opportunities in or reasonably related to the Company's business or industry of which the Employee becomes aware during the Employment Period and any period thereafter in which the Employee is receiving Severance Payments. Therefore, the Employee agrees that he will not disclose to any unauthorized person outside the ordinary course of business or use for his own account any of such information, observations or data without the Board's written consent, unless and to the extent that the aforementioned matters become generally known to and available for use by the public other than as a result of the Employee's acts or omissions to act.

6.   Noncompetition and Nonsolicitation

(a)   Noncompetition. The Employee acknowledges that in the course of his employment with the Company he will become familiar with the Company's trade secrets and with other confidential information concerning the Company and that his services will be of special, unique and extraordinary value to the Company. Therefore, the Employee agrees that, during the Employment Period and for one year thereafter (the "Noncompete Period"), he shall not directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in any business that provides telematics services to the insurance industry or otherwise competes with the businesses of the Company or its Subsidiaries or any businesses (each, a "Target Business") in which the Company or any of its Subsidiaries has entertained discussions or has requested and received information relating to the acquisition of such business by the Company or its Subsidiaries prior to the termination of the Employee's employment with the Company anywhere within the United States. Notwithstanding the foregoing, in the event the Employee is terminated by the Company without Cause, then upon at least ten days' prior written notice to the Company, the Employee may elect to have the Noncompete Period terminate on a date prior to the scheduled termination date of the Noncompete Period, in which case all subsequent Severance Payments and other obligations of the Company to the Employee pursuant to Section 4(d) above will terminate at the same time as the Noncompete Period terminates.

(b)   Nonsolicitation. During one year period following Termination, the Employee shall not directly or indirectly through another entity (i) induce or attempt to induce any employee of the Company or any Subsidiary to leave the employ of the Company or such Subsidiary, or in any way interfere with the relationship between the Company or any Subsidiary and any such employee thereof or (ii) induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or any Subsidiary to cease doing business with the Company or such Subsidiary, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any Subsidiary.

(c)   Enforcement. If, at the time of enforcement of Section 5 or 6 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.  Because the Employee's services are unique and because the Employee has access to confidential information, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement.  Therefore, in the event a breach or threatened breach of this Agreement, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security).

GENERAL PROVISIONS

7.   Definitions.

"Affiliate" of any particular person or entity means any other person or entity controlling, controlled by or under common control with such particular person or entity.

"Cause" means (i) the conviction of a felony or a crime involving moral turpitude or the commission of any act constituting dishonesty or fraud with respect to the Company or any of its Subsidiaries or any of their customers or suppliers, (ii) intentional conduct tending to bring the Company or any of its Subsidiaries into substantial public disgrace or disrepute, (iii) substantial and repeated material failure to perform duties of the office held by the Employee as reasonably directed by the Board, and such failure is not cured within 60 days after the Employee receives written notice thereof from the Board, (iv) recklessness or willful misconduct with respect to the Company or any of its Subsidiaries, or (v) any material breach of Section 5 or 6 of this Agreement, or (vi) the failure of Executive to purchase the Post-Closing Shares in accordance with terms of Section 1.(b).

"Disability" means the inability, due to illness, accident, injury, physical or mental incapacity or other disability, of the Employee to carry out effectively his duties and obligations to the Company or to participate effectively and actively in the management of the Company for a period of at least 90 days (whether or not consecutive) during any 180-day period, as determined in the reasonable judgment of the Board after receipt of competent medical advice.

"Management Stock" means all shares of Common Stock acquired by the Employee hereunder and all shares of Preferred Stock and Common Stock hereafter acquired by Employee.  "Management Stock" will continue to be Management Stock in the hands of any holder other than the Employee (except for the Company and except for transferees in a Public Sale), and except as otherwise provided herein, each such other holder of Management Stock will succeed to all rights and obligations attributable to the Employee as a holder of Management Stock hereunder.  Management Stock will also include shares of the Company's capital stock issued with respect to Management Stock by way of a stock split, stock dividend or other recapitalization.

"Exempted Securities" means:

(i)      shares of Common Stock, options or convertible securities issued by reason of a dividend, stock split, split-up or other distribution on shares of common stock;

(ii)      shares of Common Stock or options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Board of Directors of the Company;

(iii)      shares of Common Stock or convertible securities actually issued upon the exercise of options or shares of Common Stock actually issued upon the conversion or exchange of convertible securities, in each case provided such issuance is pursuant to the terms of such option or convertible security; or

(iv)      shares of Common Stock, options or convertible securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board of Directors of the Company;

(vi)      shares of Common Stock, options or convertible securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board of Directors of the Company;

(vii)      shares of Common Stock, options or convertible securities issued pursuant to the acquisition of another entity by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided, that such issuances are approved by the Board of Directors of the Company; or

(viii)      shares of Common Stock, options or convertible securities issued in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships approved by the Board of Directors of the Company.

"Family Group" means the Employee's spouse, the Employee's descendants (whether natural or adopted), the Employee's spouse's descendants (whether natural or adopted), and any trust, retirement plan, family limited partnership or other entity solely for the benefit of the Employee and/or any of the foregoing Persons.

"New Securities" means, collectively, equity securities of the Company, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Public Offering" means the sale in an underwritten public offering registered under the Securities Act of shares of the Company's Common Stock approved by the

Board. "Public Sale" means any sale pursuant to a registered public offering under the Securities Act or any sale to the public pursuant to Rule 144 promulgated under the Securities Act effected through a broker, dealer or market maker.

"Sale of the Company" means (i) any sale, transfer or issuance or series of sales, transfers and/or issuances of capital stock of the Company by the Company or any holders thereof (by merger or otherwise) which results in any Person or group of Persons (as the term "group" is used under the Securities Exchange Act), other than any Person (or Affiliate thereof) who is a stockholder as of May 20, 2010, owning a majority of the issued and outstanding Common Stock, and (ii) any sale or transfer of all or substantially all of the assets of the Company and its Subsidiaries (by merger or otherwise) in any transaction or series of trans-actions (other than sales in the ordinary course of business); provided that the term "Sale of the Company" shall not include a Public Offering.

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"Transfer" means to sell, transfer, assign, pledge or otherwise dispose of (whether with or without consideration and whether voluntarily or involuntarily or by operation of law).

3.    Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally to the recipient, sent to the recipient by reputable express courier service (charges prepaid) or mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid.  Such notices, demands and other communications shall be sent to the Purchasers and to the Company at the address indicated below:

If to the Company:

The Evogi Group
20645 N Pima Rd
Bldg N Suite 130
Scottsdale, AZ 85255

Attention: Legal

<u>with a copy to</u>:

Vincent & Rees
175 S Main St., Suite 1500
Salt Lake City, UT 84111
Attention:  Lisa Demmons

<u>If to the Employee</u>:

_____
_____
_____
_____

<u>with a copy to</u>:

_____
_____
_____
_____

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

        9.       <u>General Provisions</u>.

        (a)    <u>Transfers in Violation of Agreement</u>.  Any Transfer or attempted Transfer of any Management Stock in violation of any provision of this Agreement shall be void, and the Company shall not record such Transfer on its books or treat any purported transferee of such Management Stock as the owner of such stock for any purpose.

        (b)    <u>Severability</u>.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

        (c)    <u>Complete Agreement</u>.   This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

(d)    Counterparts.  This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(e)    Successors and Assigns.    Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Employee, the Company and their respective successors and assigns (including subsequent holders of Management Stock); provided that the rights and obligations of the Employee under this Agreement shall not be assignable except in connection with a permitted transfer of Management Stock hereunder.

(f)    Choice of Law.  The corporate law of the State of Delaware will govern all questions concerning the relative rights of the Company and its stockholders.  All other questions concerning the construction, validity and interpretation of this Agreement and the exhibits hereto will be governed by and construed in accordance with the internal laws of the State of Arizona, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Arizona or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Arizona.

(g)    Remedies.    Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(h)    Amendment and Waiver.   The provisions of this Agreement may be amended and waived only with the prior written consent of the Company and the Employee.

(i)    Business Days.   If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or holiday in the state in which the Company's primary office is located, the time period shall be automatically extended to the business day immediately following such Saturday, Sunday or holiday.

(j)    Generally Accepted Accounting Principles; Adjustments of Numbers. Where any accounting determination or calculation is required to be made under this Agreement or the exhibits hereto, such determination or calculation (unless otherwise provided) shall be made in accordance with generally accepted accounting principles, consistently applied, except that if because of a change in generally accepted accounting principles the Company would have to alter a previously utilized accounting method or policy in order to remain in compliance with generally accepted accounting principles, such determination or calculation shall continue to be made in accordance with the Company's previous accounting methods and policies.  All numbers set forth herein which refer to share prices or amounts will be appropriately adjusted to reflect stock splits, stock dividends, combinations of shares and other recapitalizations affecting the subject class of stock.

IN WITNESS WHEREOF, the parties hereto have executed this Management Agreement on the date first written above.

THE EVOGI GROUP

By:_____
Name:  Jeffrey D. Stempora
Its:      Chief Executive Officer


THE EMPLOYEE

By:_____
Name: J. Jerome Holleran Jr.

EXHIBIT  B

THE LAW FIRM OF
# LEISAWITZ HELLER
———————————— *Experience Commitment*

2755 Century Blvd., Wyomissing, PA  19610
610-372-3500 ♦ Fax: 610-372-8671
www.LeisawitzHeller.com

Kevin A. Moore, Esquire
E-mail: kmoore@LeisawitzHeller.com

*Via email and certified mail*

March 12, 2012

Stephen M. Connor, Esq.
General Counsel/Sect.
NavSeeker, Inc. d/b/a The Evogi Group
20645 N. Pima Road, Bldg. N, Ste. 130
Scottsdale, AZ  85255

Re:  T. Jerome Holleran, Jr.

Dear Mr. Connor:

  This firm represents T. Jerome Holleran, Jr., your employee and shareholder. Mr. Holleran was hired by the company and invested the sum of $125,000.00 into same by and through a certain Management Agreement dated June 16, 2011, a copy of which is attached. Since the execution of the agreement, the company has engaged in several material breaches which are the basis of this notice letter. Our client was hired to serve as the Director of Consulting Services for the term of his two year contract. Material terms of the contract included, but are not limited to, the compensation provisions set forth in paragraph 4(b) of the contract. The company has breached the agreement by failing to pay Mr. Holleran his salary since February 1, 2012. In addition, a separate material breach occurred by virtue of the company's failure to establish and implement the incentive compensation plan contemplated by paragraph 4(b)(ii) of the agreement.

  Under the circumstances, our client has no choice but to constructively discharge himself from the company's employment, effective Thursday, March 15, 2012. This discharge constitutes a "termination without cause" within the meaning of paragraph 4(g). Accordingly, Mr. Holleran is entitled to his back pay from February 1, 2012 through the date of his termination, his accrued vacation for the same period, and his annual base salary through the balance of the initial term of the contract for a total of $106,250.00 in salary and $6,732.39 in accrued but unused vacation. Under the Pennsylvania Wage Payment and Collection Law, failure to make full payment may result in the imposition of mandatory attorney's fees, liquidated damages in the amount of 25% of the amount due and owing or $500.00, whichever is greater, along with personal liability for any decision makers involved in the decision to withhold the wages due. In addition, the law requires payment in full to be made by the close of the payroll period next following the date of termination. In this instance, the total principal sum of $112,982.39 is due and payable to this office on or before March 31, 2012.

{00420162 }

Moreover, although Mr. Holleran will respect the spirit of the confidentiality provisions of the agreement, under prevailing law, the company's precedent material breach renders void and unenforceable the non-competition and non-solicitation provisions set forth in paragraph 6 of the agreement.

You will be contacted under cover of separate letter with respect to Mr. Holleran's shareholder rights. Please give this matter your immediate attention.

Very truly yours,

Kevin A. Moore

KAM/nfs
42599.002
CC     T. Jerome Holleran, Jr.
       Vincent & Rees

| | |
|---|---|
| **From:** | Nadine Stoudt |
| **Sent:** | Monday, March 12, 2012 4:41 PM |
| **To:** | 'stephen.connor@evogi.com' |
| **Subject:** | T. Jerome Holleran, Jr. |
| **Attachments:** | SKMBT_60012031215160.pdf |

Attached please find correspondence from Kevin Moore on this matter.


Nadine Stoudt
Legal Assistant to Kevin A. Moore, Esq.
and Allen R. Shollenberger, Esq.
2755 Century Blvd.
Wyomissing, PA  19610
610-372-3500
610-372-8671 fax
nstoudt@leisawitzheller.com

**NOTICE:** The information contained in this electronic mail transmission is intended by Leisawitz Heller for the use of the named individual or entity to which it is directed and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee (or person authorized to deliver it to the named addressee). It should not be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission by error, please delete it from your system without copying or forwarding it, and notifying the sender of the error by reply e-mail or by calling Leisawitz Heller at 610-372-3500 (collect), so that our address can be corrected.

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____  ☐ Agent  ☐ Addressee<br>B. Received by ( Printed Name )   C. Date of Delivery |
| 1. Article Addressed to:<br><br>Stephen M. Connor, Esq.<br>General Counsel / Sect.<br>NavSeeker, Inc. d/b/a The Evogi Group<br>20645 N. Pima, Road, Bldg. N, Ste. 130<br>Scottsdale, AZ 85255 | D. Is delivery address different from Item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No<br><br>3. Service Type<br>☒ Certified Mail   ☐ Express Mail<br>☐ Registered   ☐ Return Receipt for Merchandise<br>☐ Insured Mail   ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)   ☐ Yes |
| 2. Article Number<br>(Transfer from service label)  7010 2780 0000 3455 6831 | |

PS Form 3811, February 2004     Domestic Return Receipt     42599.002     102595-02-M-1540

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | 1.50 |
| Certified Fee | | 2.95 |
| Return Receipt Fee (Endorsement Required) | | 2.35 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 6.80 |

KRM/nFs
42599.002

MAR 1 2 2012
Postmark Here
READING PA 19610

7010 2780 0000 3455 6831

Sent To  Stephen M. Connor, Esq.
         General Counsel / Sect.
Street, Apt. No.; Nav Seeker, Inc. d/b/a The Evogi Group
or PO Box No. 20645 N. Pima Road, Bldg. N, Ste. 130
City, State, ZIP+4  Scottsdale, AZ 85255

PS Form 3800, August 2006          See Reverse for Instructions